[No. B204047. Second Dist., Div. Three. Nov. 19, 2009.]

ROBERT DAVIS, Plaintiff and Appellant, v.
FORD MOTOR CREDIT COMPANY LLC, Defendant and Respondent.

[No. B205914. Second Dist., Div. Three. Nov. 19, 2009.]

ROBERT DAVIS, Plaintiff and Respondent, v.
FORD MOTOR CREDIT COMPANY LLC, Defendant and Appellant.

582

**COUNSEL**

Levy, Ram & Olson, Arthur D. Levy, Erica L. Craven; The Harris Law Firm and Aurora D. Harris for Plaintiff and Appellant and for Plaintiff and Respondent.

Fazio Micheletti, Jeffrey L. Fazio and Dina E. Micheletti for Consumers for Automotive Reliability and Safety as Amicus Curiae on behalf of Plaintiff and Appellant and Plaintiff and Respondent.

Severson & Werson, Jan T. Chilton, Mark Joseph Kenney, Regina J. McClendon and Joshua E. Whitehair for Defendant and Appellant and for Defendant and Respondent.

OPINION

**KLEIN, P. J.**—Plaintiff and appellant Robert Davis (Davis) appeals a judgment of dismissal following the sustaining without leave to amend of a demurrer interposed by defendant and appellant Ford Motor Credit Company LLC (Ford) to Davis's original complaint.

Ford also appeals, seeking review of a postjudgment order denying its motion for attorney fees.

This litigation relates to Ford's billing practices under a retail installment sales contract. Ford's practice is to apply a customer's payment to an earlier missed installment, rather than to the current month's installment. As a result, the current month's installment is unpaid, triggering a new late fee for the current month. Davis's theory is that these successive late fees are prohibited by the Rees-Levering Motor Vehicle Sales and Finance Act (Rees-Levering) (Civ. Code, §§ 2981 et seq., 2982, subd. (k)), and are actionable under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) (hereafter, section 17200) and under the Consumers Legal Remedies Act (CLRA) (Civ. Code, §§ 1750 et seq., 1770, subd. (a)(14)).

■ We conclude the alleged conduct of Ford in charging successive late fees for successive late payments does not violate Civil Code section 2982, subdivision (k)'s prohibition on charging more than one late fee per delinquent installment. For example, if an ontime payment received during the month of April is allocated to March because the March payment was missed, the result of allocating said payment to March is that the April payment was missed, so as to trigger a new late fee for the month of April. Under those circumstances, the consumer has not been charged more than one late fee for the missed March payment. Rather, the first late fee is for the payment missed in March, and the second late fee represents the payment missed in April. Because Davis failed to allege a statutory violation under Rees-Levering, he has failed to allege Ford's billing practice is *unlawful* under the UCL.

We further conclude Davis cannot allege Ford's billing practice is an *unfair* business practice within the meaning of the UCL. Guided by *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394 [48 Cal.Rptr.3d 770] (*Camacho*), which clarified the definition of "unfair" within the meaning of the UCL, we hold Davis cannot allege an unfair business practice because the alleged injury is one he reasonably could have avoided. (142 Cal.App.4th at pp. 1403, 1406.) Simply stated, Davis could have avoided the imposition of successive late fees for successive months by

making his monthly payments timely, or within the 10-day grace period, in accordance with his obligations under the contract.

Although Ford was the prevailing party, it cannot recover its attorney fees pursuant to Rees-Levering's reciprocal attorney fee provision (Civ. Code, § 2983.4) because the alleged Rees-Levering violation was merely a predicate to the UCL claims, and a prevailing defendant cannot recover attorney fees under the UCL.

Therefore, the judgment of dismissal, as well as the postjudgment order denying Ford's motion for attorney fees, are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The complaint; pertinent allegations.*

On November 8, 2006, Davis, individually and on behalf of others similarly situated, filed suit against Ford alleging as follows:

In February 2004, Davis entered into a retail installment sales contract with Worthington Ford, Inc. (the dealer), for the purchase of a 2002 Ford Taurus for personal and family purposes.[1] The dealer sold and assigned said retail installment sales contract to Ford.

Under the contract, Davis was required to make periodic installment payments in a specific preset amount for the life of the contract. For each installment that was in default for a period of not less than 10 days, Ford was entitled to assess a delinquency charge in an amount not to exceed 5 percent of the delinquent installment, which amount may be collected only once on any installment, regardless of the period during which it remains in default. (Civ. Code, § 2982, subd. (k).)[2]

Ford "applied certain of [Davis's] regular on-time installment payments against past due installments to trigger multiple late charges where there was

---

[1] Davis did not append a copy of the retail installment sales contract to his complaint. Davis subsequently appended a copy of the contract to his opposition to Ford's demurrer and requested judicial notice of the contract. In reviewing the sufficiency of the pleading, we treat the contract as having been pled. (See Discussion, I. Davis's Appeal, pt. 1, *post*.)

[2] Civil Code section 2982 states in relevant part at subdivision (k): "The contract may provide that for each installment in default for a period of not less than 10 days the buyer shall pay a delinquency charge in an amount not to exceed in the aggregate 5 percent of the delinquent installment, *which amount may be collected only once on any installment regardless of the period during which it remains in default.*" (Italics added.)

only one late payment, and has engaged and continues to engage in the same practice with respect to the members of the Class."

Based on these allegations, Davis sought to plead the following six causes of action:

(1) Violation of the CLRA, specifically, Civil Code section 1770, subdivision (a)(14), based on Ford's representation that it is entitled to apply ontime monthly installments against prior outstanding installments so as to trigger multiple late payments and multiple late fees, contrary to the letter and spirit of the retail installment sales contracts which permit only one late fee per late installment payment.

(2) Violation of Rees-Levering (Civ. Code, § 2982, subd. (k)), so as to constitute an unlawful business practice under the UCL. (§ 17200.)

(3) Violation of the CLRA (Civ. Code, § 1770, subd. (a)(14)), so as to constitute an unlawful business practice under the UCL.

(4) Unlawful and unfair business practice within the meaning of the UCL, in that Ford's billing practices cause consumer injury by the assessment of late charges far in excess of the amounts actually expended by Ford to collect its accounts; consumers cannot reasonably avoid the injury which flows from Ford's practice because Ford's interpretation is not apparent on the face of the contracts and consumers cannot shop around in advance to avoid this undisclosed interpretation; there are no countervailing benefits to consumers or competition from Ford's practice; Ford's practice systematically breaches the contracts of plaintiffs and violates the letter and spirit of and has the same effect as a violation of the Federal Trade Commission Act, title 15 United States Code section 45; and Ford's practice violates the letter and spirit of, and has the same effect as, a violation of Rees-Levering, Civil Code section 2982, subdivision (k).

(5) Unfair and deceptive business practices within the meaning of the UCL.

(6) Money had and received and unjust enrichment based on the unwarranted late charges.[3]

2. *Ford's demurrer.*

Ford demurred to the complaint in its entirety, asserting no cause of action was stated.

---

[3] Davis is not pursuing all these theories on appeal. The Discussion, *post*, is confined to the contentions raised by Davis in his opening brief on appeal. (See *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1233, fn. 6 [60 Cal.Rptr.3d 631].)

By way of background, the contract stated in pertinent part: "How we will apply payments. We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract *in any order we choose.*" (Italics added.)

Ford argued, inter alia, Rees-Levering did not prohibit its exercise of its contractual right to allocate payments it receives to the oldest outstanding installment and charging a late fee if, as a result, the current installment is not paid timely. "[Civil Code section 2982, subdivision (k)] bans assessment of multiple charges for a single late installment. It does not dictate how a creditor must allocate a payment received when two or more installments are due and unpaid. It does not prohibit [Ford's] practice of attributing payments to the oldest outstanding installment. [¶] Since [Ford] may allocate a payment to the oldest outstanding installment, its imposition of late fees is also in keeping with [the statute]. [Ford] charges only one late fee on any one installment. When multiple installments are due, each new payment is allocated to the oldest installment. If doing so leaves a newer installment unpaid, a late fee is assessed for that installment, but only one fee is assessed for any one installment." Ford emphasized, "[h]ad the Legislature intended to prohibit [Ford's] practice, it could and would have done so expressly, as it did in Civil Code section 2954.4 governing late fees on home mortgage loans. Section 2982(k) contains no similar language."

Ford further contended its practice did not violate the UCL, and that no claim was stated for violation of the CLRA because its representations were truthful, and further, Civil Code section 1770, subdivision (a)(14) was intended to proscribe presale misrepresentations, such as false advertising, not postsale, postdefault exercises of creditors' remedies.

### 3. *Davis's opposition to the demurrer.*

In opposition, Davis asserted, inter alia, "[*Ford*] *is correct that* [*Civil Code section 2982, subdivision (k)*] *does not specify how monthly installment payments may be applied* and plaintiff does not, as [Ford] argues, claim that section 2982(k) requires any particular allocation of payments between principal and interest. . . . [*Ford*] *can allocate an on-time April payment against a missing March payment, for example*, applying the April payment to the outstanding interest from both the March and April payments and the remainder to unpaid principal under section 2982(k). What defendant *cannot* do is then trigger a second late fee, since the only installment missed was March." (Some italics added.)

### 4. *Trial court's ruling.*

On June 26, 2007, the matter was argued and taken under submission. On September 24, 2007, the trial court sustained the demurrer without leave to amend, and set forth its rationale in an extensive written ruling.

In essence, the trial court held: Civil Code section 2982, subdivision (k), permits a penalty to be charged for "each installment in default for a period of not less than 10 days." In the hypothetical pled in the complaint, when the consumer skips the September payment and makes an ontime installment payment in October, Ford is entitled to apply the October payment to the September delinquency. As a consequence, the September delinquency is satisfied but the installment due for October is late. Thus, Ford is entitled to impose a late charge for the October installment, which installment is in default. In this situation, the consumer is not being charged more than one delinquency charge on a late installment—one late fee is charged for the September installment and the second late fee is charged for the October installment, which installment is late as a consequence of the October payment having been applied to September.

The trial court concluded, "the Rees-Levering Act does not preclude the conduct alleged in the Complaint. Insofar as the UCL and CLRA causes of action are premised on a violation of the Rees-Levering Act, these causes of action fail as well. Insofar as Plaintiff seeks to characterize [Ford's] practices alleged in the Complaint as unfair or as unfair trade practices, these claims fail because, although the California Legislature has comprehensively regulated lender practices in the area of automobile installment loans, the Legislature has not seen fit to proscribe the practices alleged in the Complaint."

On November 5, 2007, the trial court entered a judgment of dismissal following the sustaining of Ford's demurrer without leave to amend. On November 16, 2007, Davis filed notice of appeal from the judgment.

### 5. *Subsequent proceedings.*

On November 19, 2007, Ford filed a motion for an award of $29,723.50 in attorney fees. Ford sought attorney fees pursuant to Rees-Levering, specifically, Civil Code section 2983.4, which provides for an award of reasonable attorney fees "to the prevailing party in any action on a contract or purchase order subject to the provisions of this chapter regardless of whether the action is instituted by the seller, holder or buyer."

In opposition, Davis contended the action was not an "action on a contract or purchase order subject to the [provisions of Rees-Levering]." Rather, the second cause of action, which alleged a violation of Rees-Levering, was merely using that statute as the predicate for a claim under the UCL.

Davis further argued the attorney fee provision of Rees-Levering does not apply when a plaintiff primarily pleads causes of action under other consumer protection statutes that allow fee awards only to prevailing plaintiffs, and that under the UCL and CLRA only a prevailing party may obtain an award of attorney fees in the absence of litigation abuse.

On December 18, 2007, the matter came on for hearing. The trial court denied Ford's motion for attorney fees, stating: "Here, the plaintiff was not seeking to enforce his contract with defendant. Rather, he was seeking a remedy on the basis that the contract violated the law and should be avoided and that he should recover remedies for defendant's violation of law. [¶] So in my judgment the attorneys' fees provision does not apply . . . ."

On February 7, 2008, Ford filed a timely notice of appeal from the postjudgment order denying its motion for attorney fees.

## CONTENTIONS

Davis contends: the second cause of action under the UCL is properly predicated on a violation of Rees-Levering; Ford's late payment accounting practice violates Rees-Levering and therefore is illegal under the UCL; alternatively, Ford's practice violates the unfairness prong of the UCL; and Ford's conduct is independently actionable under the CLRA.

Ford urges affirmance of the judgment of dismissal and contends the trial court erred in denying its motion for attorney fees.

## DISCUSSION

### I. DAVIS'S APPEAL

1. *Standard of appellate review.*

On review of a demurrer, in addition to the allegations of the complaint, we may consider other relevant matters which are properly the subject of judicial notice and we may treat such matters as having been pleaded. We therefore treat the retail installment sales contract as having been pled in its entirety. (*City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678 [1 Cal.Rptr.3d 312]; *Coopers & Lybrand v. Superior*

*Court* (1989) 212 Cal.App.3d 524, 538 [260 Cal.Rptr. 713]; *Marina Tenants Assn. v. Deauville Marina Development Co.* (1986) 181 Cal.App.3d 122, 128, 132 [226 Cal.Rptr. 321].)

In determining whether a plaintiff has properly stated a claim for relief, "our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) Our review is de novo. (*Ibid.*)

> 2. *The alleged conduct of Ford in charging successive late fees for successive months does not violate Civil Code section 2982, subdivision (k)'s prohibition on charging more than one late fee per delinquent installment; therefore Davis cannot predicate his UCL claim of an unlawful practice on a violation of Rees-Levering.*
>
>> a. *The result of allocating a current payment to an earlier missed installment is that the current installment is unpaid, triggering a new late fee for the current month; said practice is not barred by Rees-Levering.*

The contract provides in pertinent part: "How we will apply payments. We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract *in any order we choose.*" (Italics added.)

Ford's practice is to attribute a customer's payments to the oldest outstanding installment. As a result, if a payment is received on time during the current cycle, but the payment is attributed to an earlier missed installment, the current installment becomes past due, triggering a late fee for the current cycle.

Davis contends this billing practice contravenes Civil Code section 2982, subdivision (k), which states in relevant part: "The contract may provide that

for each installment in default for a period of not less than 10 days the buyer shall pay a delinquency charge in an amount not to exceed in the aggregate 5 percent of the delinquent installment, *which amount may be collected only once on any installment regardless of the period during which it remains in default.*" (Italics added.)

Davis acknowledges the statute does not specify how monthly installment payments may be applied, and Davis does not contend the statute requires any particular allocation of payments between principal and interest. Davis concedes "[Ford] can allocate an on-time April payment against a missing March payment, for example, applying the April payment to the outstanding interest from both the March and April payments and the remainder to unpaid principal under section 2982(k)." Davis asserts "What [Ford] *cannot* do is then trigger a second late fee, since the only installment missed was March. There have not been any other installments 'in default.' "

Davis's argument does not withstand scrutiny. If an ontime payment received during the month of April is allocated to March because the March payment was missed, the result of allocating said payment to March is that the April payment was missed, so as to trigger a new late fee for the month of April. Under those circumstances, the consumer has not been charged more than one late fee for the missed March payment. Rather, the first late fee is for the payment missed in March, and the second late fee represents the payment missed in April.

We agree with the trial court's analysis in this regard and reiterate its ruling as follows: "As [Ford] points out, however, under the hypothetical pleaded by way of example in the Complaint, the first penalty is for a payment missed in September, and the second penalty is for a payment missed in October. When the consumer makes one payment in October, but does not bring the contract payments current by making up the September missed payment, the Rees-Levering Act does not preclude the automobile finance creditor from applying the October payment to the September delinquency.

"Plaintiff concedes that the Rees-Levering Act permits the automobile finance creditor to apply the October payment to the September delinquency for purposes of interest calculation. . . . Plaintiff affirms that he 'does *not* challenge the *way* [Ford] applies payments under section 2982(k).' . . . He does not seek to void the contract provision stating that [Ford] 'may apply each payment to the earned and unearned part of the Finance Charge [interest], to the unpaid part of the Amount Financed [principal] and to other amounts you owe under this section in any order we choose.' . . . Plaintiff does not proffer a convincing argument for construing the statute to permit application of the October payment (in the hypothetical) to satisfy the

September delinquency for purposes of calculation of interest, but not for purposes of calculating penalties.

"The statutory language . . . permits a penalty to be charged for 'each installment in default for a period of not less than 10 days . . . .' (Civ. Code, § 2982(k).) In the hypothetical, when the consumer makes only one installment payment in October, he has satisfied the September delinquency but is late in making the October payment. [Ford] is permitted to apply the October payment to the September delinquency. Thus a late charge can be imposed for the October installment, which is in default."

We conclude Davis has failed to allege Ford's practice of attributing a current payment to an earlier missed installment, so as to trigger a late fee for the current installment, violates Rees-Levering. Therefore, Davis has failed to allege an unlawful practice under the UCL predicated on a violation of Rees-Levering.

The vice which Civil Code section 2982, subdivision (k) eliminates is the practice of "pyramiding" of late charges. "By limiting the holder to one charge for each overdue installment, no matter how long it is overdue, the practice of pyramiding is eliminated." (Project, *Legislative Regulation of Retail Installment Financing* (1960) 7 UCLA L.Rev. 623, 699.) An illustration of the practice of pyramiding of late charges is as follows: "Assume a monthly payment of $10, with a late charge of 5 per cent of the installment a month. In the first month, the failure to pay will result in a late charge of fifty cents. In the second month, a new payment is late, and an additional fifty cents is charged, but the first payment is now overdue an additional month, and a second fifty cents is charged for that. The buyer now owes $1.50 in late charges. While this may not seem unreasonable, if the installment is not paid up by the sixth month, the late charges for the delinquencies will amount to 100 per cent of the installment. Thereafter, the charges continue to increase. If the buyer now resumes his monthly payments of $10, they will be attributed to the delinquency charges and not to the unpaid balance of the obligation. Not only will the buyer never catch up, but he will continue to lose ground because the delinquency charge for each additional month becomes far in excess of the $10 he is paying." (*Id.* at p. 698.)

Here, Ford's practice of attributing a payment to a previous missed installment, rather than to the current month, has the effect of leaving the current installment unpaid, so as to trigger a new late fee for the current month. However, irrespective of how long an installment is overdue, the consumer is assessed only a single late charge for each overdue installment, in compliance with Civil Code section 2982, subdivision (k). Simply stated, Davis's allegations are not within the scope of the harm which the statute sought to address.

b. *Davis's argument is more appropriately addressed to the Legislature.*

By way of comparison, Civil Code section 2954.4, subdivision (b), relating to mortgages, states in relevant part: "A late charge may not be imposed on any installment which is paid or tendered in full on or before its due date, or within 10 days thereafter, even though an earlier installment or installments, or any late charge thereon, may not have been paid in full when due. *For the purposes of determining whether late charges may be imposed, any payment tendered by the borrower shall be applied by the lender to the most recent installment due*." (Italics added.)

Thus, as the trial court observed, "if the hypothetical set forth in the Complaint is translated to a home loan context, the creditor would be required to apply the payment made in October to the October installment, precluding a late charge in October. It appears, then, that when the Legislature intends the result the Plaintiff seeks here, the Legislature expressly provides for that result. Restrictions that are legislated for other consumer installment loan contexts should not be read into the Rees-Levering Act. Plaintiff argues that Civil Code section 2954.4 was enacted after the Rees-Levering Act, and that the Legislature simply was more complete in section 2954.4. But the Rees-Levering Act was amended frequently after enactment of Civil Code section 2954.4, and the Legislature has not seen fit to add to the Act the restriction adopted in the home loan context."

3. *Davis cannot allege an unfair practice under the UCL.*

In a backup argument, Davis contends that even if Rees-Levering (Civ. Code, § 2982, subd. (k)) does not specifically prohibit Ford's accounting method, the practice is nonetheless independently actionable as an *unfair* business practice under the UCL. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*) [practice that is not unlawful may nevertheless be unfair practice under UCL].)

a. *General principles; the definition of an unfair practice in consumer cases.*

" 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Cel-Tech, supra,* 20 Cal.4th at p. 180.) However, the UCL does not precisely define the term "unfair" and "courts have struggled to come up

with a workable definition." (*Gregory v. Albertson's Inc.* (2002) 104 Cal.App.4th 845, 851 [128 Cal.Rptr.2d 389] (*Gregory*).)

The "state of the law on what constitutes an unfair business practice in consumer cases is somewhat unsettled in light of *Cel-Tech*[, *supra*,] 20 Cal.4th 163 . . . . [¶] Prior to *Cel-Tech*, whether a practice was 'unfair' under section 17200 required the court to engage in a balancing test. (See, e.g., *Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 969 [69 Cal.Rptr.2d 623].) 'Determination of whether a business practice or act is "unfair" within the meaning of the UC[L] entails examination of the impact of the practice or act on its victim, " '. . . balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . .' [Citation.]" [Citation.]' (*Id.* at pp. 969–970.)" (*Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 285 [37 Cal.Rptr.3d 434] (*Progressive*).)

In "*Cel-Tech*, our Supreme Court concluded that in the context of a dispute between business competitors, this balancing test was 'too amorphous and provide[d] too little guidance to courts and businesses.' ([*Cel-Tech*], *supra*, 20 Cal.4th at pp. 185, 187, fn. 12.) Thus, the court adopted the following test, '[w]hen a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.' (*Id.* at p. 187.) At the same time, the court declared, 'This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. *Nothing we say relates to actions by consumers* or by competitors alleging other kinds of violations of the unfair competition law such as "fraudulent" or "unlawful" business practices or "unfair, deceptive, untrue or misleading advertising." ' (*Id.* at p. 187, fn. 12.) *Thus, the court chose to leave for another day whether this test of unfairness applies to consumer cases as well.*" (*Progressive, supra*, 135 Cal.App.4th at pp. 285–286, italics added.)

The issue left open by *Cel-Tech* has led to "a split of authority on this question among the Courts of Appeal. (See *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1273–1274 [39 Cal.Rptr.3d 634] [noting the split of authority and urging the California Supreme Court to resolve it].)" (*Belton v. Comcast Cable Holdings, LLC, supra,* 151 Cal.App.4th at p. 1239; see also *Lozano v. AT&T Wireless Services, Inc.* (9th Cir. 2007) 504 F.3d 718, 736 [noting split of authority with respect to definition of "unfair" in consumer cases].)

One line of cases is represented by the post-*Cel-Tech* decision of *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700 [113 Cal.Rptr.2d 399] (*Smith*), in which we applied the earlier balancing test in a consumer action, stating: " 'The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrong-doer. *In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . .* [Citations.]" [Citation.] In *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164], the court, acknowledging that the parameters of the term "unfair business practice" had not been defined in a California case, applied guidelines adopted by the Federal Trade Commission and sanctioned by the United States Supreme Court in *FTC v. Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179, 92 S.Ct. 898]. The court concluded that an "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' [Citation.]" (*Smith, supra,* 93 Cal.App.4th at pp. 718–719, italics added, fn. omitted.)[4]

Another line of cases is represented by *Gregory, supra,* 104 Cal.App.4th 845, which applied a more rigorous standard for unfairness. "In *Gregory, supra,* 104 Cal.App.4th 845, 854, the appellate court disagreed with the use of the pre-*Cel-Tech* definition of 'unfair' in *Smith*, stating, '*Cel-Tech*, how-ever, may signal a narrower interpretation of the prohibition of unfair acts or practices in all unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the court found to be "too amorphous." [Fn. omitted.] Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.' (See also *Schnall v. Hertz Corp.* [(2000)] 78 Cal.App.4th [1144,] 1166 [93 Cal.Rptr.2d 439] [*Cel-Tech* holding that '*any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy' also applied to UCL actions brought by consumers]; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1072 [13 Cal.Rptr.3d 586] [in consumer UCL action, court stated, 'given the Supreme Court's disapproval of *State Farm* [*Fire & Casualty Co. v. Superior Court* [(1996)] 45 Cal.App.4th 1093 [53 Cal.Rptr.2d 229]]'s "amorphous" definition of "unfair" practices and its focus on legislatively declared public policy, reliance on general common law principles to support a cause of action for unfair competition is unavailing']; *Churchill Village, L.L.C. v. General Elec. Co.* (N.D.Cal. 2000) 169 F.Supp.2d

---

[4] In *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539 [72 Cal.Rptr.3d 888], this division applied the *Smith* definition of unfairness.

1119, 1130 & fn. 10 [holding *Cel-Tech*'s definition of unfair also applies to consumer UCL actions]; *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147 [135 Cal.Rptr.2d 796] [court applied *Cel-Tech* test in consumer UCL action, stating '[t]o show a business practice is unfair, the plaintiff must show the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition" '].)" (*Bardin v. DaimlerChrysler Corp., supra,* 136 Cal.App.4th at pp. 1271–1272; accord, *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940 [134 Cal.Rptr.2d 101] [*Cel-Tech* narrowed the expansive earlier interpretations of the term unfair to require that the public policy which is a predicate to the action must be tethered to specific constitutional, statutory or regulatory provisions].)

> b. *A third approach;* Camacho's *clarification of the definition of "unfair" in consumer cases.*

*Camacho, supra,* 142 Cal.App.4th 1394, contains an excellent analysis of the issue and we adopt its definition of "unfair" in consumer cases. *Camacho* states in relevant part:

"The question is whether *Cel-Tech*'s definition of 'unfair' overrules appellate court opinions that use other definitions. We think that it does. Definitions that are too amorphous in the context of anticompetitive practices are not converted into satisfactorily precise tests in consumer cases. This squares with the fact that, in disapproving appellate court opinions defining 'unfair' in 'amorphous' terms, the Supreme Court did not hold that the old definitions were appropriate in consumer cases.

"We do not think, however, that this means that the finding, in a consumer case, that the practice is unfair must be ' "tethered" to specific constitutional, statutory or regulatory provisions,' as one Court of Appeal has put it. (*Gregory v. Albertson's, Inc., supra,* 104 Cal.App.4th at p. 854 . . . .) In other words, we do not think that *Cel-Tech*'s definition of 'unfair' in cases involving anticompetitive practices applies to consumer cases. [¶] There are two reasons for this.

"First, 'tethering' a finding of unfairness to 'specific constitutional, statutory or regulatory provisions' does not comport with the broad scope of section 17200. 'Tethering' the concept of unfairness to existing positive law undercuts the principle that a practice is prohibited as 'unfair' or 'deceptive,' even if it is not 'unlawful' or vice versa. (*Cel-Tech, supra,* 20 Cal.4th at p. 180.) As our Supreme Court has put it, the courts need to deal with innumerable new schemes that the fertility of man's invention can contrive (*Barquis v.*

*Merchants Collection Assn.* [(1972)] 7 Cal.3d [94,] 112 [101 Cal.Rptr. 745, 496 P.2d 817]); in the context of consumer cases, 'tethering' to positive law undercuts the ability of the courts to deal with new situations, and new abuses.

"Second, anticompetitive conduct is best defined in terms of the policy and spirit of antitrust laws; the same cannot be said of a business practice that is 'unfair' or 'deceptive' in the terms of section 17200. That is, cases involving anticompetitive conduct move in a far smaller, and more clearly defined, universe than unfair or deceptive business practices. It is therefore possible to 'tether' anticompetitive conduct to the antitrust laws, while the universe of laws and/or regulations that bear on unfair practices is so varied that it is not possible to achieve a consensus which of these laws and regulations might apply to define an unfair practice.

■ "*Cel-Tech* itself holds the key to the definition of 'unfair' in consumer cases. *Cel-Tech* holds that 'we may turn for guidance to the jurisprudence' arising under section 5 of the Federal Trade Commission Act. (*Cel-Tech, supra,* 20 Cal.4th at p. 185.) Since 1980, the factors that define unfairness under section 5 are: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided. (*Orkin Exterminating Co. v. F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1364.) These factors have now been codified in title 15 United States Code section 45(n).[5] *This definition of 'unfair' is on its face geared to consumers and is for that reason appropriate in consumer cases.* It is also suitably broad and is therefore in keeping with the 'sweeping' nature of section 17200. We will refer to this as the 'section 5 test.' " (*Camacho, supra,* 142 Cal.App.4th at pp. 1402–1403, italics added, fns. omitted.)

> c. *Davis cannot allege unfairness under the section 5 test*
> *for unfairness in a consumer case.*

To reiterate, the factors that define unfairness under the Federal Trade Commission Act section 5 test (section 5 test) are: (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any counter-vailing benefits to consumers or competition; and (3) it must be an injury that

---

[5] Title 15 United States Code section 45(n) provides: "The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair *unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.* In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. *Such public policy considerations may not serve as a primary basis for such determination.*" (Italics added.)

consumers themselves could not reasonably have avoided. (*Camacho, supra*, 142 Cal.App.4th at p. 1403.)

In *Camacho*, with regard to the third prong of the section 5 test, the appellate court held "the 'injury' in this case is one that [the plaintiff] could have reasonably avoided by complying with the law and obtaining insurance. Thus, even if there is some theory under which [the plaintiff] can claim that he was 'injured,' the fact is that he could have avoided any and all action taken by defendants by obtaining and carrying insurance, as the law requires." (*Camacho, supra*, 142 Cal.App.4th at p. 1406.)

In the instant case, the alleged injury here, namely, the imposition of successive late fees for successive months, reasonably could have been avoided had Davis made his monthly payments timely, or within the 10-day grace period, in accordance with his obligations under the contract.[6]

Because Davis reasonably could have avoided the alleged injury, it is unnecessary to address the other elements of the section 5 test. We conclude Davis has not stated, and cannot state, a claim under the unfairness prong of the UCL. (§ 17200.)

### 4. *Davis failed to state cause of action under the CLRA.*

Finally, Davis contends Ford's conduct is independently actionable under the CLRA.

In his first cause of action, Davis sought to allege a violation of the CLRA, specifically, Civil Code section 1770, subdivision (a)(14), based on Ford's representation it is entitled to apply ontime monthly payments against prior outstanding installments so as to trigger multiple late payments and multiple late fees, contrary to the letter and spirit of the retail installment sales contracts which permit only one late fee per late installment payment.[7]

---

[6] In this regard, Ford's respondent's brief states: "Like most creditors, [Ford] now sends its customers monthly statements which show when late fees have been imposed and which installments are due. So, even if Davis did not know at the outset of his contract that [Ford] would allocate his payments to the oldest outstanding installment, he could have learned that fact by examining his monthly statement the month after he first skipped a payment—and he could thereafter have avoided further late fees by simply paying as agreed."

Davis does not deny that Ford sent him monthly statements indicating the imposition of a late fee and the amount that was due.

[7] Civil Code section 1770 states in relevant part: "(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: [¶] . . . [¶] (14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

However, as discussed above, what Ford represented to Davis was correct, not a misrepresentation. Ford was entitled under the retail installment sale contract to allocate payments to the oldest outstanding installment and to assess a late fee on the late installment payments. In doing so, Ford did not violate Civil Code section 2982, subdivision (k), because Ford did not impose more than one late fee on any installment—the successive late fees were imposed for successive late installments.

Accordingly, Ford did not misrepresent any "rights, remedies, or obligations." (Civ. Code, § 1770, subd. (a)(14).) We conclude the CLRA claim was not well pled.

## II.   FORD'S APPEAL

*The complaint sought to allege a violation of the UCL, predicated on a violation of Rees-Levering, as opposed to a claim under Rees-Levering; Ford cannot recover fees because the UCL precludes a fee award to a prevailing defendant.*

a.   *Overview.*

Ford based its motion for attorney fees on Rees-Levering's attorney fee provision, which states in relevant part: "Reasonable attorney's fees and costs shall be awarded to the prevailing party *in any action on a contract or purchase order subject to the provisions of this chapter* regardless of whether the action is instituted by the seller, holder or buyer." (Civ. Code, § 2983.4, italics added.)

The trial court denied the attorney fee motion on the ground Davis was not seeking to enforce the contract, but rather, was "was seeking a remedy on the basis that the contract violated the law and should be avoided . . . ." We uphold the trial court's ruling because it is correct in result, irrespective of the trial court's rationale. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

Turning to the allegations of the complaint, the second cause of action states in relevant part: "34. As a result of [Ford's] practice . . . of allocating consumers' on-time monthly installment payments against previous missed payments to trigger multiple late charges, [Ford] ha[s] violated the Rees-Levering Act, Civ. Code § 2982(k). [¶] 35. *These acts and business practices, therefore, are unlawful business practices within the meaning of . . . sections 17200 et seq.*" (Italics added.)

Similarly, in the fourth cause of action, Davis pled Ford's violation of Rees-Levering was an *unfair business practice* within the meaning of section 17200 of the UCL.

Thus, the pleading alleged a violation of Rees-Levering merely as the predicate to the claim Ford engaged in unlawful or unfair business practices within the meaning of the UCL.

The issue presented is whether these allegations by Davis entitle Ford, as the prevailing defendant, to recover its attorney fees pursuant to Rees-Levering.

        b.   *General principles; a prevailing defendant in a suit under the UCL cannot recover attorney fees.*

By way of background, the UCL does not provide for attorney fees, and relief is generally limited to injunctive relief and restitution. (*Cel-Tech, supra,* 20 Cal.4th at p. 179.) "If a plaintiff prevails in an unfair competition law claim, it may seek attorney fees as a private attorney general pursuant to Code of Civil Procedure section 1021.5. *There is no provision for such a right for a successful defendant.*" (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1179 [121 Cal.Rptr.2d 79], italics added (*Walker*).)

Thus, "where a plaintiff sues solely under the unfair competition law, fees may not be recovered by a prevailing defendant. But if a plaintiff does not bring suit solely under the unfair competition law, the trial court has discretion to apportion fees to claims not brought pursuant to that law—as long as those claims authorize attorney fees awards." (*Walker, supra,* 98 Cal.App.4th at p. 1180.)

        c.   *Rees-Levering's reciprocal fee provision is inapplicable when an alleged Rees-Levering violation is merely a predicate to a UCL claim; the public policy underlying the UCL must prevail over the reciprocal fee provision of Rees-Levering.*

*Brown v. West Covina Toyota* (1994) 26 Cal.App.4th 555 [32 Cal.Rptr.2d 85] (*Brown*) involved a similar conflict between two statutory schemes. There, the plaintiffs bought a used car from the defendants pursuant to a written contract. After the plaintiffs found defects in the car and learned it had been in an accident prior to their purchase, they sued the defendants under the Song-Beverly Consumer Warranty Act (Song-Beverly) (Civ. Code, § 1790 et seq.), commonly known as the automobile "lemon law." After the trial court directed a verdict in the defendants' favor, the defendants successfully moved for an award of attorney fees and costs pursuant to Rees-Levering (Civ. Code, § 2983.4), on the theory that the underlying transaction giving rise to the lawsuit involved the sale of a vehicle under a contract which was subject to the provisions of Rees-Levering. (*Brown, supra,* 26 Cal.App.4th at pp. 557–559.)

■ "The *Brown* court thus confronted a situation where plaintiffs alleged defendants violated the Song-Beverly Act, in a case in which the vehicle was purchased pursuant to a conditional sales contract subject to the Rees-Levering Act. Because only the Rees-Levering Act permitted a prevailing defendant to recover costs and attorney fees, the court was faced with reconciling the two sets of laws. To resolve the conflict, the court reasoned that to permit a prevailing defendant to invoke the fee-shifting provisions of the Rees-Levering Act in that case 'would effectively nullify the one-sided fee-shifting under Song-Beverly whenever a plaintiff sues to enforce a breach of warranty claim under Song-Beverly, but happens to have purchased the automobile under a conditional sale contract.' (*Brown, supra*, 26 Cal.App.4th at p. 565.) The *Brown* court then invoked the ' "cardinal rule of statutory construction that statutes relating to the same subject matter are to be read together and reconciled whenever possible to avoid nullification of one statute by another." ' [Citation.] Accordingly, the [*Brown*] court rejected defendants' contention the Rees-Levering Act should apply; rather, applying the Song-Beverly Act, the court concluded defendants were not entitled to costs or attorney fees." (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 995 [73 Cal.Rptr.2d 682, 953 P.2d 858] (*Murillo*).)

■ Here, as in *Brown*, although the underlying transaction was subject to the provisions of Rees-Levering, the action was not prosecuted under Rees-Levering. Davis did not sue directly under Rees-Levering—rather, the alleged Rees-Levering violation was merely a predicate to the complaint's UCL claims. We hold Rees-Levering's reciprocal fee provision is inapplicable when an alleged Rees-Levering violation is merely a predicate to a UCL claim, in that the public policy underlying the UCL must prevail over the reciprocal fee provision of Rees-Levering. Therefore, Ford was not entitled to recover attorney fees pursuant to Rees-Levering's attorney fees provision (Civ. Code, § 2983.4).[8]

---

[8] *Murillo* held a prevailing defendant is entitled to recover costs pursuant to the generally applicable cost recovery rule set forth in Code of Civil Procedure section 1032, subdivision (b), notwithstanding Song-Beverly's provision awarding costs and attorney fees only to the prevailing buyer (Civ. Code, § 1794, subd. (d)). (*Murillo, supra*, 17 Cal.4th at p. 999.) *Murillo* "disapprove[d] *Brown* to the extent it holds Civil Code section 1794(d) constitutes an 'express' exception to the general rule permitting a prevailing party, including a prevailing defendant, to recoup its costs of litigation" pursuant to Code of Civil Procedure section 1032, subdivision (b). (*Murillo, supra*, 17 Cal.4th at p. 996.) *Murillo* has no bearing on *Brown*'s analysis that the prevailing defendants/sellers in the Song-Beverly action were not entitled to recover attorney fees pursuant to Rees-Levering. With respect to attorney fees, *Murillo* states: "*Nothing in our opinion addresses that issue. Sellers are not seeking attorney fees, and there is no 'default' attorney fee recovery provision akin to [Code of Civil Procedure] section 1032(b).*" (*Murillo, supra*, at p. 999, italics added; accord, *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 146–147 [118 Cal.Rptr.2d 569].)

## DISPOSITION

The judgment of dismissal, and the postjudgment order denying Ford's motion for attorney fees, are affirmed. The parties shall bear their respective costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied December 8, 2009, and appellant's petition for review by the Supreme Court was denied March 10, 2010, S179049. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.